1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                            EASTERN DISTRICT OF CALIFORNIA

10

11   WILLIAM ROBERT STANKEWITZ,        )   1:06-cv-01220-LJO-JLT HC
                                        )
12          Petitioner,                 )   FINDINGS AND RECOMMENDATIONS
                                        )   TO DENY PETITION FOR WRIT OF
13          v.                          )   HABEAS CORPUS  (Doc. 1)
                                        )
14   MIKE McDONALD, Warden,             )   ORDER DIRECTING THAT OBJECTIONS BE
                                        )   FILED WITHIN TWENTY DAYS
15          Respondent.                 )
     _____    )

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                              **PROCEDURAL HISTORY**

20          1.  State Court Procedural History.

21          Petitioner is in custody of the California Department of Corrections and Rehabilitation

22   ("CDCR")  serving an indeterminate sentence up to life, pursuant to a judgment of the Superior

23   Court of California, County of Madera (the "Superior Court").  On November 24, 2003, Petitioner

24   was convicted by jury trial of (1) gross vehicular manslaughter while intoxicated (Cal. Pen. Code §

25   191.5(a)); (2) driving while having a .08 percent or more blood alcohol level while causing great

26   bodily injury (Cal. Veh. Code § 23153(b)); and (3) driving while under the influence of alcohol

27   while causing bodily injury (Cal. Veh. Code § 23153(a)).  (Clerk's Transcript on Appeal ("CT") p.

28   366).  Petitioner admitted three prior strike convictions under California's Three Strikes Law.  (CT

321).  On December 19, 2003, Petitioner was sentenced to an indeterminate sentence of thirty years

to life for the manslaughter conviction, and twenty-five years to life for having a blood alcohol level

exceeding .08 percent while causing great bodily harm.  (CT 366).  The trial court stayed an

additional twenty-five-years-to-life term on the driving under the influence while causing bodily

harm conviction.  (Id.).

Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth

Appellate District (the "5th DCA"), raising all of the issues alleged by Petitioner in the instant

petition.  On February 14, 2005, the 5th DCA, in a partially published decision, affirmed Petitioner's

conviction.  (Lodged Document ("LD") 4).[1]   On March 2, 2005, Petitioner filed a petition for review

in the California Supreme Court.  (LD 7).  The petition was granted on May 18, 2005, but further

action was deferred pending resolution of other cases before the high court.  (LD 8).  Review was

dismissed on September 7, 2005.  (LD 9).  Petitioner has not filed any state habeas petition in any

California court related to his 2003 conviction.

2.  Federal Court Procedural History.

On September 7, 2006, Petitioner filed the instant petition, raising six grounds for relief.

Petitioner filed the instant petition on September 7, 2006, raising six grounds for relief.  (Doc. 1).

On December 18, 2008, the Court ordered Respondent to file a response.  (Doc. 8).  On January 28,

2008, Petitioner filed a motion to stay proceedings in order to exhaust remedies in state court.  (Doc.

12).  Before the Court could rule on Petitioner's motion for stay, Respondent filed a motion to

dismiss the petition, contending that one of the six claims was unexhausted.  (Doc. 13).  On July 24,

2008, the Court granted Petitioner a stay of proceedings to permit Petitioner to exhaust his claim in

state court.  (Doc. 19).

In that order, the Court required Petitioner to file regular status reports regarding his

exhaustion efforts.  Following the filing of status reports on May 19, 2008, August 15, 2008, and

October 3, 2008, Petitioner filed a status report on November 13, 2008 indicating that the California

Court of Appeal, Fifth Appellate District ("5th DCA"), had denied his state habeas petition on

---

[1]Lodged Documents 1-10  were proffered by Respondent as part of the original motion to dismiss.  (Doc. 13).
Lodged Documents 11-34 were lodged as part of Respondent's Answer.  (Doc. 41).

1   October 6, 2008. (Doc. 24). In that status report, Petitioner also requested an extension of time of

2   sixty days in which to prepare his "opposition to the appellate denial" of his state petition. (Id.). On

3   November 25, 2008, the Court issued an informational order explaining to Petitioner that he must

4   exhaust his claim in the California Supreme Court and that he must continue to file regular status

5   reports or the stay would be lifted. (Doc. 25).

6          On January 14, 2010, after fourteen months of silence on the part of Petitioner, during which

7   he failed to file any status reports or other updates with this Court, the Court issued an Order to

8   Show Cause why the stay should not be lifted. (Doc. 26). On March 25, 2010, Petitioner further

9   filed a document indicating that he was "presently exhausting his state remedies in the California

10  Supreme Court as of March 21, 2010," and that he would file his next status report on or about April

11  21, 2010. (Doc. 32). The Court, however, was unable to find any evidence in the state court

12  electronic records that Petitioner had filed any document with the California Supreme Court.

13  Accordingly, on May 7, 2010, the Court issued an order lifting the stay of proceedings and making

14  Findings and Recommendations to grant Respondent's original motion to dismiss for lack of

15  exhaustion as to ground six. (Doc. 33). On June 17, 2010, the District Judge adopted the Findings

16  and Recommendations and requiring that Petitioner move to withdraw ground six within fifteen days

17  or face dismissal of the entire petition. (Doc. 34). On July 6, 2010, Petitioner moved to withdraw

18  ground six. (Doc. 35). On July 7, 2010, the Court granted that motion and also ordered Respondent

19  to file an Answer to the remaining five claims. (Doc. 36). On October 5, 2010, Respondent filed the

20  Answer. (Doc. 41). On January 4, 2010, Petitioner filed his Traverse. (Doc. 46).

21                                      **FACTUAL BACKGROUND**

22          The Court adopts the Statement of Facts in the 5th DCA's partially published decision:

23          William Stankewitz (defendant) and his aunt, Wilma Lewis, spent from the morning
            of June 21,1999 to the morning of June 22, 1999, driving Lewis's Mercury Cougar in
24          and around the Big Sandy Rancheria, where defendant and Lewis both lived, and in a
            larger area in Madera and Fresno counties. At around 9:00 or 10:00 o'clock on the
25          morning of June 21, defendant and Lewis began drinking beer as they drove.
            Defendant's girlfriend and an elderly neighbor rode with them part of the day and also
26          drank beer. The four of them purchased and consumed at least 38 cans of beer. Late
            that night, defendant and Lewis arrived, both intoxicated, at a relative's house in
27          Fresno. They continued drinking there, and headed back toward the Rancheria in
            Auberry in the early morning.

28

On the way, at about 7:00 o'clock in the morning, they were involved in a fatal accident. In a rural area, at an intersection controlled by a stop sign, the Cougar hit another car broadside, killing the driver. Lewis was thrown from the car. As she lay unconscious on the ground, defendant knocked on the door of a nearby house and asked to use the phone. The resident called 911 and spoke to the operator and then handed the phone to defendant, who used it to call a friend. Defendant tried to hide in the yard of the house, and held his finger to his lips to warn the resident not to tell the police of his location. When officers found him, he told them he knew nothing about the accident and did not know the injured woman. He said he was in the area looking for farm work and had spent the night at the intersection sleeping in a van, which had since left. The police arrested him after finding documents bearing his name in the car. His blood alcohol level was .16 percent, double the threshold amount for driving under the influence. (Veh. Code, § 23 152.)

Lewis was injured seriously in the accident. She suffered fractures of her left arm, left ankle, and eighth right rib, a dislocated left knee, and other wounds, including lacerations of her scalp and left leg. At the hospital, Lewis told officers that defendant was the driver.

Defendant appeared uninjured at the scene of the accident. Several days later, while in jail, he reported pain extending from the middle of his lower back to his right ankle and in one shoulder, which he attributed to the accident. He was treated with Motrin.

After the accident, the Cougar was moved to Ron's Towing, a commercial towing yard in Madera. There, it was kept inside a building until July 2, 1999, 10 days after the accident. On July 2, the police informed Ron's Towing that the evidence hold was released, and the car was moved outdoors. Ron's Towing covered the car's open windows with plywood to keep its guard dogs from entering, but otherwise the car was exposed to the elements. An employee of Ron's Towing testified at the first trial that the front bumper, which had come off in the accident, was placed inside the car.

As far as the record discloses, the car was not examined by anyone after the day of the accident until early August 1999, when an investigator from the District Attorney's office and two members of the California Highway Patrol's Multi-disciplinary Accident Investigation Team (MAIT) examined and photographed it. The goal of the MAIT investigation was to determine, based on the damage to the car and the injuries to defendant and Lewis, which of them was the driver.

At about the same time, an investigator with the Public Defender's office also viewed the car. He saw debris inside.

After the MAIT officers' inspection, CHP informed Ron's Towing that it no longer needed the car and it was "released from evidence." Ron's Towing sold the car to Romero's Towing, a dismantler in Los Banos, where it was moved on August 6 or August 7, 1999.

Defendant retained counsel to replace the Public Defender on August 26, 1999. The Public Defender's office incorrectly told defendant's new counsel that the car had been destroyed and was not available for inspection. Nevertheless, defendant's new investigator found the car at Romero's Towing in September 1999. It was outdoors, stacked atop another wrecked car.

Defendant's counsel arranged with the District Attorney's office to return with his investigator to Romero's Towing for an inspection. The inspection did not take place until January 4, 2000. By that time, the car had been moved to another place on the lot

and altered in several ways since defendant's investigator first saw it in September: The entire front end had been cut off with a welding torch; the wheels were removed; the seat belts had been cut off; and the seat backs were damaged and in different positions than before.

Defendant was tried three times for his role in the accident. In the first trial, a mistrial was declared when the jury was unable to reach a verdict. After defendant was convicted in the second trial, the court granted his motion for a new trial based on ineffective assistance of counsel.

In the third prosecution, defendant was charged with the following offenses: (1) gross vehicular manslaughter (of the other car's driver) while intoxicated (Pen. Code, § 191.5, subd. (a)); (2) vehicular manslaughter (of the other car's driver) while intoxicated (§ 192, subd. (c)(3)); (3) driving under the influence of alcohol while concurrently committing another offense (i.e., running a stop sign) and causing bodily injury (to Lewis) (Veh. Code, § 23153, subd. (a)); (4) driving with a blood alcohol level of .08 percent or more while concurrently committing another offense and causing bodily injury (to Lewis) (Veh. Code, § 23153, subd. (b)); and (5) running a stop sign (Veh. Code, § 22450). The information also alleged three prior serious or violent felonies (all robberies) pursuant to the three strikes law.

At trial, defendant's defense was that Lewis was the driver and he was not. Both sides presented expert testimony on this issue. The two MAIT officers who examined the car testified that, based on the exterior damage to the car, they determined the direction in which the occupants moved inside the car during the crash. From that information, plus the damage to the interior of the car, the nature of the injuries to defendant and Lewis, and the fact that Lewis was ejected through the passenger window, they determined that defendant was sitting in the driver's seat and Lewis in the passenger seat at the time of the crash. Defendant's expert, Garrith Perrine, testified that he evaluated essentially the same information and reached the opposite conclusion. A third MAIT officer gave testimony to rebut Perrine's.

The jury found defendant guilty of gross vehicular manslaughter of the other driver while intoxicated (count 1); driving while under the influence and injuring Lewis (count 3); and driving with a blood alcohol level of .08 or more and injuring Lewis (count 4). Subsequent statutory references are to the Penal Code unless indicated otherwise.

The court found the prior conviction allegations true and denied defendant's request to dismiss prior strike convictions. On count 1, it selected the upper term of 10 years as set forth in section 191.5, subd. (c), and increased it to 30 years to life pursuant to the three strikes law. (§ 667, subd. (e)(2)(A)(i).) On count four, the court imposed a consecutive three-strikes term of 25 years to life. (§ 667, subd. (e)(2)(A)(ii).) It stayed the sentence on count 3 pursuant to section 654.

(LD 4, pp. 2-6).

## DISCUSSION

### I.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of

1   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362,

2   375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the

3   United States Constitution.  The challenged conviction arises out of the Madera County Superior

4   Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.

5   § 2241(d).  Accordingly, the Court has jurisdiction over this action.

6         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

7   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

8   Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries

9   v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on

10   other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed

11   after statute's enactment).  The instant proceedings were initiated by the filing of the original petition

12   on September 7, 2006, after the enactment of the AEDPA, and thus this case is governed by the

13   AEDPA.

14      **II.  Legal Standard of Review**

15         A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he

16   can show that the state court's adjudication of his claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court of
> the United States; or
>
> (2)  resulted in a decision that "was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

21   28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S.

22   at 412-413.

23         The first prong of federal habeas review involves the "contrary to" and "unreasonable

24   application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and mixed

25   questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford, 384 F.3d

26   628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established federal law "if it

27   applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it

28   confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but

reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. at 405. A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Brown v. Payton, 544 U.S. at 141; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). Section 2254(d)(1)'s reference to "clearly established Federal law" refers to "the governing legal principle or principles set forth by [the Supreme Court] at the time a state court renders its decision." Lockyer v. Andrade, 538 U.S. at 64; Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005).

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment"). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340. Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of

1   historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943,

2   976-077 (2004).

3   　　　To determine whether habeas relief is available under § 2254(d), the federal court looks to

4   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

5   Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

6   Where the state court decided the petitioner's claims on the merits but provided no reasoning for its

7   decision, the federal habeas court conducts "an independent review of the record...to determine

8   whether the state court [was objectively unreasonable] in its application of controlling federal law."

9   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853

10  (9th Cir. 2003).  "[A]lthough we independently review the record, we still defer to the state court's

11  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court

12  denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the

13  deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's

14  claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

15  　　　The prejudicial impact of any constitutional error is assessed by asking whether the error had

16  "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

17  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding

18  that the Brecht standard applies whether or not the state court recognized the error and reviewed it

19  for harmlessness).  Some constitutional errors, however, do not require that the petitioner

20  demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v.

21  Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA

22  alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

23  Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the

24  Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque,

25  555 F.3d 830, 835 (9th Cir. 2009).

26  　　　**III.  Review of Petitioner's Claims.**

27  　　　The instant petition itself alleges the following as grounds for relief:

28  　　　Ground One　　　　　The Government's Destruction Of Evidence Critical To The

Prosecution And Defense Cases Violated Petitioner's Due Process Right.

Ground Two          The Exclusion Of Critical Impeachment Evidence Of Key Prosecution Witness Wilma Lewis Violated The Fifth, Sixth, And Fourteenth Amendments To The U.S. Constitution.

Ground Three        The Gross Vehicular Manslaughter While Intoxicated Conviction Is Not Supported By Substantial Evidence Of Gross Negligence In Violation Of The Substantial Evidence Rule Derived From The fifth And Fourteenth Amendments' Due Process Clause.

Ground Four         The Right To A Jury Trial On Aggravating Facts Was Violated In Contravention Of The Sixth Amendment To The U.S. Constitution.

Ground Five         The Petitioner's Sentence Pursuant To The California's "Three Strikes Law" Is A De Facto Term Of Life Without The Possibility Of Parole And Is An Unconstitutionally Grossly Disproportionate Punishment.

Due process standards require that criminal defendants be afforded a meaningful opportunity to present a complete defense, including "what might loosely be called the area of constitutionally guaranteed access to evidence." United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440 (1982). It is a violation of a criminal defendant's right to due process when law enforcement agencies fail to preserve evidence that "possess[es] an exculpatory value that was apparent before the evidence was destroyed and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably attainable means." California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528 (1984). Due process only requires preservation of "evidence that might be expected to play a significant role in the suspect's defense." Trombetta, 467 U.S. at 488. The exculpatory value of such evidence must have been apparent before the evidence was destroyed, and the defendant must also be unable to reasonably obtain comparable evidence. Id. at 489.

However, to protect the courts from the "treacherous task of divining the import of materials whose contents are unknown," unless a criminal defendant can show bad faith on the part of law enforcement, "failure to preserve potentially useful evidence does not constitute a denial of due process." Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333 (1988). "Bad faith" consists of official animus towards [the accused] or a conscious effort to suppress exculpatory evidence."

1   *Trombetta*, 467 U.S. at 488.  "The presence or absence of bad faith by [law enforcement] for

2   purposes of the Due Process Clause must necessarily turn on the police's knowledge of the

3   exculpatory value of the evidence at the time it was lost or destroyed."  *Youngblood*, 488 U.S. at 56,

4   n. *.

5       Petitioner asserts that his constitutional rights were violated because the government retained

6   the car for only ten days before releasing it, after which it was not preserved for evidentiary purposes.

7   (Doc. 1, p. 6).  In rejecting this contention, the 5th DCA reasoned as follows:

8       Two cases, *California v. Trombetta* , 467 U.S. 479 (1984) (*Trombetta*) and *Arizona v.*
        *Youngblood*, 488 U.S. 51 (1988) (*Youngblood*), set forth the standards for a federal
9       due process violation caused by the prosecution's failure to preserve evidence. In
        *Trombetta*, the court held:

10
            "Whatever duty the Constitution imposes on the States to preserve
11          evidence, that duty must be limited to evidence that might be expected
            to play a significant role in the suspect's defense.  To meet this
12          standard of constitutional materiality, [citation], evidence must both
            possess an exculpatory value that was apparent before the evidence
13          was destroyed, and be of such a nature that the defendant would be
            unable to obtain comparable evidence by other reasonably available
14          means." (*Trombetta*, *supra*, 467 U.S. at pp. 488-489, fn. omitted.)

15      In *Youngblood*, the court stated that "unless a criminal defendant can show bad faith
        on the part of the police, failure to preserve potentially useful evidence does not
16      constitute a denial of due process ...." (*Youngblood*, *supra*, 488 U.S. at p. 58.)

17      It is not obvious how *Trombetta* and *Youngblood* relate to each other.  Does
        *Youngblood* add a bad-faith test for all constitutional destruction-of-evidence
18      challenges? Or must the defendant show bad faith when the evidence was merely
        "potentially useful" (*Youngblood, supra*, 488 U.S. at p. 58), but not when it had
19      "exculpatory value" that was "apparent" (*Trombetta, supra*, 467 U.S. at pp. 488-489)?
        The parties in this case take opposing positions on whether Trombetta or *Youngblood*
20      applies and thus on whether defendant must show bad faith to prevail.

21      In California courts, the *Trombetta* and *Youngblood* standards are applied in tandem.
        If evidence has an exculpatory value that is apparent before the evidence was
22      destroyed, the *Trombetta* approach applies and the state has a duty to preserve it.  But
        "[t]he state's responsibility is [more] limited when" the evidence was merely
23      potentially useful. In that case, the state breaches its duty only if it acts in bad faith.
        (*People v. Beeler* (1995) 9 Cal. App. 953, 976.)

24
        Under the approach of *Beeler*, we conclude that the state satisfied its duty under
25      *Trombetta*, so defendant can prevail only by showing bad faith within the meaning of
        *Youngblood*.  Defendant has not shown that, in allowing the car to be altered, the
26      state destroyed anything with apparent exculpatory value.  The essence of defendant's
        defense was an interpretation of the same information that the People's experts, the
27      MAIT officers, relied on.  In his appellate briefs, defendant relies on the testimony of
        his expert, Perrine, about contamination of the car, but that testimony does little to
28      support defendant's claims.  Perrine did not identify anything that might have

happened to the car after the officers inspected it that would have compromised the defense's ability to independently evaluate the evidence.  Nothing in Perrine's testimony supports the contention that alterations to the car after the MAIT inspection-the removal of the front end, wheels and seat belts, the damage to the seat backs, the continued exposure to the elements, or anything else--could have made any difference to his investigation or his conclusions.  The removal of the front end might have been relevant to analyzing the "principal direction of force-i.e., the line of force that determined which way the occupants moved and which interior parts they would have struck-since most of the collision damage was to the front end. But Perrine agreed with the MAIT report's conclusion regarding the principal direction of force and raised no doubts about what he might have found if he had been able to examine the front end himself.

In fact, Perrine's complaints about the preservation of the car were addressed primarily to the fact that the car was left outside before the MAIT officers inspected it.  Regarding that period, however, Perrine simply said that he could not tell what evidence might have been contaminated.  As for the officers' work after that point, Perrine testified that they "did as much of a detailed workup as probably [they] could have done," and that the measurements and information they obtained were "very helpful in being able to reconstruct the accident . . ."  Ironically, because he became involved in the case too late to inspect the car himself, Perrine relied on the facts in the MAIT report in developing his own contrary conclusions.  He believed that in spite of the passage of time between the accident and the MAIT inspection, "[t]here was still physical evidence available that someone could interpret and then place specifics as to [whom] the driver might have been as a result of that physical evidence."

Perrine did call attention to a smudge or abrasion that the officers found on the glove compartment door and correlated with one of Lewis's injuries.  He testified that this evidence was unreliable because the smudge could have been caused after the accident. But the smudge is not, of course, an example of evidence that was destroyed, and if its reliability was doubtful, the jury was apprised of that by Perrine's testimony.

Perrine also criticized the officers' failure to remove and closely inspect the brake and accelerator pedals.  He asserted that this might have revealed damage consistent with injuries to Lewis's feet and legs, showing that she was driving.  But in his appeal, defendant does not claim that the pedals were missing or unavailable for inspection when his investigator and attorney inspected the car.  Nothing in the record supports the contention that this evidence was destroyed or contaminated.

Defendant also contends that his rights were violated when the officers failed to check the steering wheel for fingerprints or perform chemical tests on interior surfaces to discover invisible traces of tissue or blood for DNA testing.  Notably, defendant does not claim that when he inspected the car he attempted such testing and found it fruitless because of exposure to the elements or some other cause. Consequently, there is no basis for concluding that this evidence was destroyed even if it existed in the first place.  There is no evidence that nontesting by the police constituted destruction of evidence with apparent exculpatory value.  The record discloses that there may have been nothing to test and, in any event, defendant was not prevented from having tests performed.

Finally, defendant contends that the police failed to preserve evidence that may have existed on the road or ground near the accident.  Perrine testified that the police could have made records of footprints, impressions in the soil, and tire tracks.  But

defendant offers no explanation of how such evidence might have helped him, assuming it existed.

In sum, defendant has not shown that there was evidence that was lost that might have exculpated him. We therefore cannot say that the state failed to satisfy the <u>Trombetta</u> requirement that it preserve evidence with apparent exculpatory value.

The question remains whether, under <u>Youngblood</u>, there was bad-faith destruction of evidence that was potentially useful to defendant. The police act in bad faith in destroying evidence if they have actual knowledge of its exculpatory value (even if that exculpatory value is not apparent) before they destroy it. (<u>Youngblood, supra</u>, 488 U.S. 51,56, fn *.) Nothing in the record indicates that the police had actual knowledge of the exculpatory value of any evidence that was not preserved.

Defendant argues that bad faith is present because the police knew the car was important evidence to prove who was driving. Even so, the car was released from its evidence hold only 10 days after the accident, before the defense (or the prosecution) could inspect it sufficiently. This argument represents a misunderstanding of the rule of <u>Youngblood</u>. Bad faith is established under <u>Youngblood</u> if the police actually know that evidence is exculpatory and destroy it anyway. To say the police knew the evidence was important is not to say they knew it was exculpatory. To say they allowed the car to be stored under unsecured conditions and to be damaged is not to say they allowed it to be destroyed, i.e., altered in ways that were consequential to defendant's defense.

Defendant relies on a number of cases in which courts found due process violations under <u>Trombetta</u> and <u>Youngblood</u> when police destroyed evidence that was central to the prosecution's case before the defense had access to it. In <u>U.S. v. Belcher</u>, 762 F.Supp. 666 (W.D.Va. 1991), police disposed of plants before anyone had tested them. The plants formed the basis of a prosecution for marijuana cultivation. (<u>Id.</u> at p. 668.) The court granted the defendant's motion to dismiss the indictment on federal due process grounds, among others. (<u>Id.</u> at p. 672.) It stated that the plants were "absolutely crucial and determinative to [the] prosecution's outcome," and that it was "a troubling prospect if government officials can routinely destroy drugs, then argue that the drugs had no exculpatory value because the government officials 'knew' that the drugs were indeed drugs." (<u>Id.</u> at pp. 672-673.) In <u>Roberson v. State</u>, 766 N.E.2d 1185 (Ind. App. 2002), the defendant was convicted of possessing a weapon while a prisoner. The alleged weapon consisted of "two halves of a food spreader (similar to a tongue depressor)," which "had been split long-ways and had rough edges." The state discarded this object before the defendant had an opportunity to examine it, and the only other evidence of it was a poor-quality photograph. (<u>Id.</u> at p. 1186.) The court reversed the conviction, citing <u>U.S. v. Belcher</u>, <u>supra</u>, 762 F.Supp. 666. It stated that without the physical evidence, the defendant was "faced with the monumental task of presenting a defense in which he is obliged to accept the subjective opinions of . . . government officials" who testified that the sticks were dangerous. (<u>Roberson v. State</u>, <u>supra</u>, 766 N.E.2d at pp. 1189-1 190.) Finally, in <u>People v. Walker</u>, 628 N.E.2d 971 (Ill. App. 1993), a robbery case, the police discarded clothing that "played a central role in defendant's defense of misidentification." (<u>Id.</u> at pp. 972,974.) The court affirmed the dismissal of the indictment based on denial of due process. (<u>Id.</u> at pp. 973, 974.)

The present case is unlike all of these because here the car was only altered, not destroyed. If the car had been destroyed (and no photographs had been taken of it), defendant would have been deprived of access to crucial evidence. But because it was only altered, it is incumbent upon defendant to show that the alterations caused

1   something consequential for his defense to be lost. He has failed to do so.
    Defendant's briefs imply that the car was destroyed as completely as the plants, sticks,
2   and clothing at issue in the cases discussed above, but that is simply not the case.

3   Defendant has failed to show that any exculpatory evidence was destroyed within the
    meaning of Trombetta or that the police acted in bad faith within the meaning of
4   Youngblood. Therefore, he has not established a due process violation under the
    federal Constitution. Defendant's brief asserts that his due process rights under the
5   California Constitution were violated as well, but he does not argue that a different
    analysis than that under the federal Constitution should be applied.
6

7   (LD 4, pp. 6-11).[2]

8        As is obvious from the introductory paragraph of this section, the 5th DCA properly identified

9   and employed the correct federal constitutional standard under Trombetta and Youngblood. Thus,

10  the only issue for this Court is whether the 5th DCA's application of that standard was objectively

11  unreasonable. For the reasons set forth below, the Court concludes that it was not.

12       First, the state court correctly noted that the vehicle was not destroyed but merely altered.

13  Second, the state court correctly pointed out that the defense expert, Perrine, failed to identify

14  anything related to the alteration of the car that impacted that expert's opinion that Lewis was the

15  driver nor did Perrine provide any testimony that such alterations actually destroyed exculpatory

16  evidence. Regarding possible fingerprint, blood, or DNA evidence, the court stated that no defense

17  witness claimed that he or she had sought such evidence but could not locate it because the vehicle

18  had been exposed to the elements. From these factors, the state court correctly concluded that the

19  defense had failed to establish that exculpatory evidence had been destroyed under Trombetta and

20  Youngblood.

21       Next, the state court concluded that, even if such evidence had been destroyed, Petitioner had

22  failed to establish bad faith by the government as required by the Supreme Court. The 5th DCA

23  correctly determined that the vehicle was released from police custody before both the defense and

24  the prosecution had concluded their examinations, that there was no evidence that the police had

25  reason to believe exculpatory evidence would be destroyed, and therefore no bad faith had been

26

27  _____

28       [2] Although in his direct appeal, Petitioner appears to have raised a number of issues related to purported destruction of evidence, i.e., failure to investigate evidence that may have existed on the ground or near the accident site, in the instant petition Petitioner limits the issue to the State's failure to preserve the automobile. (Doc. 1, p. 6).

1    shown:

2        To say the police knew the evidence was important is not to say they knew it was
         exculpatory.  To say they allowed the car to be stored under unsecured conditions and
3        to be damaged is not to say they allowed it to be destroyed, i.e., altered in ways that
         were consequential to defendant's defense.
4

5    (LD 4, p. 10).  As mentioned, for Due Process purposes, the lack of knowledge by police of the

6    exculpatory value of the evidence at the time it was lost or destroyed is the critical factor in

7    concluding that bad faith is absent.  Youngblood, 488 U.S. at 56, n. *.

8        From the foregoing, the Court agrees with the state court's conclusion that Petitioner failed to

9    establish any "official animus towards [the accused] or a conscious effort to suppress exculpatory

10   evidence."  Trombetta, 467 U.S. at 488.  Thus, the state court's adjudication of this issue was not

11   objectively unreasonable and Petitioner's claim in this regard should be rejected.

12       **Ground Two**              **The Exclusion Of Critical Impeachment Evidence Of Key
                                      Prosecution Witness Wilma Lewis Violated The Fifth, Sixth, And
13                                    Fourteenth Amendments To The U.S. Constitution.**

14       Petitioner contends that his constitutional rights were violated when the trial court

15   declined to permit Petitioner's attorney to introduce evidence of passenger Wilma Lewis' 1983

16   misdemeanor conviction for driving under the influence of alcohol.  (Doc. 1, p. 7).  Respondent

17   responds that Petitioner's claim does not raise a federal habeas corpus claim or, alternatively, if it

18   does, the state court correctly decided the issue.  The Court disagrees with Respondent that the claim

19   does not raise a federal habeas issue, but agrees with Respondent that the state court adjudication

20   excluding such evidence did not satisfy AEDPA's stringent standards.

21       In its opinion, the 5th DCA rejected Petitioner's arguments as follows:

22       Lewis testified for the prosecution, stating that she stopped driving before the accident
         and passed out in the passenger seat, while defendant got in the driver's seat.  When
23       she woke up, she was in the hospital.  To impeach her, defendant proffered evidence
         of her 1993 felony conviction for false imprisonment and her 1983 misdemeanor
24       conviction for driving under the influence.  The court admitted the former but
         excluded the latter, stating:  "I think it's too remote; it's 20 years old; it's a
25       misdemeanor; it has little probative value in my mind, so it's excluded."  Defendant
         now argues that this ruling was an abuse of discretion under Evidence Code section
26       352 and violated defendant's constitutional rights.  We disagree.

27       Evidence that a witness has committed a crime of moral turpitude generally is
         admissible to impeach the witness.  The crime need not be one involving dishonesty.
28       (People v. Castro (1985) 38 Cal.3d 301, 315.)  It also need not be a felony.  (People v.

Wheeler (1992) 4 Cal.4th 284,295-296.)   Driving under the influence has been held admissible for impeachment in criminal proceedings where the witness was a recidivist felony drunk driver.  (People v. Forster (1994) 29 Cal.App.4th 1746, 1757-1758.)  We will assume, without deciding, that misdemeanor driving under the influence can constitute a crime of moral turpitude for purposes of impeachment.

Even so, we find no reversible error here.   The decision whether to admit or exclude impeachment evidence is within the discretion of the trial court, as is the decision whether to admit or exclude evidence under Evidence Code section 352.   (People v. Clair (1992) 2 Cal.4th 629,654-655.)  The California Supreme Court has stated that a trial court retains its discretion to exclude evidence under Evidence Code section 352 even if the evidence is relevant for impeachment purposes. (People v. Clair, supra, at pp. 654- 655.)   A court abuses its discretion if its decision exceeds the bounds of reason. (Ibid.)  Otherwise admissible evidence should be excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice ...." (Evid. Code, § 352.)

Here, the court found that the DUI conviction was remote in time and had little probative value. The potential for undue prejudice was apparent:  The jury might impermissibly have used the evidence to conclude not just that Lewis lacked credibility, but that she had a propensity for drunk driving.  The court's statement implies that it concluded there was a probability of undue prejudice that substantially outweighed the probative value of the past conviction.  "Surely," as in Clair, "another court might have concluded otherwise."  (People v. Clair, supra, 2 Cal.4th at p. 655.) But that "reveals nothing more than that a reasonable difference of opinion was possible."   It does not show an abuse of discretion. (Ibid.)

Defendant argues that the exclusion of the evidence also violated his rights to due process, confrontation, and cross-examination under the federal and California Constitutions.  This argument is without merit.  Defendant has cited no case holding that a trial was fundamentally unfair, or a defendant was unconstitutionally denied his right to confront or cross-examine an adverse witness, by a trial court's reasonable conclusion that impeachment evidence was substantially more prejudicial than probative.  As in People v. Boyette (2002) 29 Cal.4th 381,427, defendant's "attempt to inflate garden variety evidentiary questions into constitutional ones is unpersuasive."

(LD 4, pp. 11-14).

Preliminarily, the Court disagrees with Respondent that the claim does not raise a federal habeas corpus issue, except as to Petitioner's equal protection argument, discussed more fully infra. In Petitioner's Petition for Review filed in the California Supreme Court, Petitioner's attorney clearly framed the exclusion of Lewis' 1983 DUI conviction as a federal issue.  In that Petition for Review, defense counsel spent virtually the entire five pages devoted to this argument explaining the relationship between the state court's purported abuse of discretion in excluding this conviction and Petitioner's right to Due Process and Equal Protection.  Counsel cited both state court decisions as well as numerous United States Supreme Court cases in an attempt to persuade the state high court

1   that sufficient California Supreme Court decisions had found the exclusion of "remote" convictions

2   violated of California law to justify a conclusion that Petitioner's right to a fair trial and

3   confrontation of witnesses was violated.  (LD 7, pp. 13-17).  Under such circumstances,

4   Respondent's argument that Petitioner has failed to state a federal habeas claim should be rejected.

5          That Ground Two states a claim is not, however, to say that the claim has merit; it does not.

6   As the excerpt from the 5th DCA's decision above indicates, the state court expressly declined to

7   decide whether, under California case law, the 1983 DUI conviction constituted a crime of moral

8   turpitude and thus was admissible as impeachment evidence.  Instead, assuming the conviction was a

9   crime of moral turpitude, the 5th DCA focused on whether, under Evidence Code section 352, the

10  trial court abused its discretion in excluding the evidence notwithstanding the fact that it could have

11  been admitted as a crime of moral turpitude.  Noting its remoteness and lack of probative value, the

12  appellate court concluded that the trial court had not abused its discretion under California's

13  evidence rules.

14         The question now, therefore, is whether such a discretionary decision violated Petitioner's

15  federal constitutional right to a fair trial and to confront witnesses.  The 5th DCA's decision gave

16  short-shrift to Petitioner's federal constitutional argument and did not provide an actual legal

17  analysis of the constitutional principles involved nor did the state court articulate any legal theory

18  that would support its rejection of Petitioner's claim.  Rather, the state court merely indicated that

19  Petitioner had failed to cite any federal case that specifically held that an exercise of discretion by the

20  state court to exclude defense evidence violated the federal constitution.

21         Notwithstanding this deficiency, this Court is constrained to review the state court's

22  adjudication of this issue with the normal deference required by 2254.  The "unreasonable

23  application of" standard applies where the state court denied a claim without providing any reasoning

24  whatsoever.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d

25  976, 982 (9th cir. 2000).  Such decisions are considered adjudications on the merits and are, therefore,

26  entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081, 1089 (9th cir. 2002);

27  Delgado, 233 F.3d at 982.  The federal habeas court assumes that the state court applied the correct

28  law and analyzes whether the state court's summary denial was based on an objectively unreasonable

1    application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

2        The United States Supreme Court recently reaffirmed this view in Harrington v. Richter,

3    ___S.Ct. ___, 2011 WL 148587 (January 19, 2011).  In that case, the High Court, addressing

4    whether a California Supreme Court summary disposition was an adjudication on the merits

5    requiring full AEDPA deference, affirmed that such deference was due:

6        By its terms § 2254(d) bars relitigation of any claim "adjudicated on the merits" in
         state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).  There is no
7        text in the statute requiring a statement of reasons.  The statute refers only to a
         "decision," which resulted from an "adjudication."  As every Court of Appeals to
8        consider the issue has recognized, determining whether a state court's decision
         resulted from an unreasonable legal or factual conclusion does not require that there
9        be an opinion from the state court explaining the state court's reasoning. [Citations
         omitted.]  Where a state court's decision is unaccompanied by an explanation, the
10       habeas petitioner's burden still must be met by showing there was no reasonable basis
         for the state court to deny relief.  This is so whether or not the state court reveals
11       which of the elements in a multipart claim it found insufficient, for § 2254(d) applies
         when a "claim," not a component of one, has been adjudicated.

12

13   Richter, ___S.Ct. ___, 2011 WL 148587.  Accordingly, the Court will review this claim to determine

14   whether the state court adjudication was contrary to or an unreasonable application of clearly

15   established federal law, according the state court's determination with appropriate AEDPA

16   deference.

17       A.  Due Process and Denial of a Right To Present A Defense.

18       The Due Process Clause of the Fifth Amendment states that "no person shall . . . be deprived

19   of life, liberty, or property, without due process of law. . . ." Substantive due process prevents the

20   government from engaging in conduct that "shocks the conscience," Rochin v. California, 342 U.S.

21   165, 172, 72 S.Ct. 205, 209 (1952), or interferes with rights "implicit in the concept of ordered

22   liberty." Palko v. Connecticut, 302 U.S. 319, 325-326, 58 S.Ct. 149 (1937).   Substantive due process

23   forbids the government from infringing on certain "fundamental" liberty interests "unless the

24   infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292,

25   301-02, 113 S.Ct. 1439, 1447 (1993);  Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061,

26   1068 (1992); Bowers v. Hardwick, 478 U.S. 186, 191, 106 S.Ct. 2841, 2844 (1986).

27       Because a violation of state law does not ordinarily provide a basis for habeas relief, Estelle

28   v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475 (1991), the state court's evidentiary ruling, even if

erroneous, is grounds for federal habeas relief only if it rendered the state proceedings so fundamentally unfair as to violate due process. <u>Drayden v. White</u>, 232 F.3d 704, 710 (9th cir. 2000); <u>Spivey v. Rocha</u>, 194 F.3d 971, 977-978 (9th cir. 1999). Criminal defendants have a fundamental due process right, implicit in the Sixth Amendment, to present a defense. <u>Washington v. Texas</u>, 388 U.S. 14, 19, 87 S.Ct. 1920 (1967); <u>see also Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986). That right, however, is not unlimited. <u>Greene v. Lambert</u>, 288 F.3d 1081, 1090 (9th Cir. 2002). A state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary and disproportionate" and "infringe[s] upon a weighty interest of the accused." <u>United States v. Scheffer</u>, 523 U.S. 303, 308, 118 S.Ct. 1261 (1998), <u>Crane</u>, 476 U.S. at 689-691(discussing the tension between the discretion of the state courts to exclude evidence at trial and the federal constitutional right to present a complete defense).

When evidence in a state proceeding has been excluded pursuant to an evidentiary law, the Ninth Circuit uses a balancing test:

> In weighing the importance of evidence offered by a defendant against the state's interest in exclusion, the court should consider the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense. A court must also consider the purpose of the [evidentiary] rule; its importance; how well the rule implements its purpose; and how well the purpose applies to the case at hand. The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence.

<u>Alcala v. Woodford</u>, 334 F.3d 862, 877 (9th Cir. 2003); <u>see also Perry v. Rushen</u>, 713 F.2d 1447, 1452-53 (9th cir. 1983).

Applying the foregoing standard to the facts in this case, the Court concludes that Petitioner was not denied the right to present a defense in violation of his due process rights. First, the probative value of the excluded evidence on the primary issue, i.e., Petitioner's criminal culpability, was de minimis. This is necessarily so because the evidence was proffered for the limited purpose of impeachment, under California law, could *not* have been used to show that Lewis was the driver because she had a propensity for driving while intoxicated. Second, it is questionable whether a twenty-year-old conviction would have any actual impeachment value given its remoteness, a factor that the trial court considered, and introducing the evidence would present the jury with the difficult

1   task of assessing how much or how little such a remote conviction could impact Lewis' credibility.

2   Moreover, this conviction was not the only impeachment evidence: the more recent 1993 false

3   imprisonment conviction, a felony unlike the 1983 misdemeanor conviction, was also introduced at

4   trial.  Accordingly, from an impeachment standpoint, the 1983 conviction was merely cumulative.

5   Third, the conviction did not constitute a major part of the defense, which relied heavily upon expert

6   testimony as to the issue of the driver's identity.

7        Giving, as this Court must, due weight to "the substantial state interest in preserving orderly

8   trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence," Alcala, 334 F.3d at

9   877, and considering the balancing of factors discussed above, the state court adjudication upholding

10  the trial court's exclusion of the 1983 DUI conviction was not objectively unreasonable under the

11  AEDPA.

12        B.  Equal Protection.

13        As to this particular sub-argument, the Court agrees with Respondent that it fails to state a

14  cognizable federal habeas claim.  Therefore, the claim should be denied.

15        A petitioner is generally foreclosed from establishing an equal protection violation on the

16  basis that the state court failed to apply its existing case law to him.  At most, such a claim usually

17  amounts to an allegation that the state court in the petitioner's case misapplied state law, or that the

18  state court departed from its earlier decisions.  "Under clearly established Supreme Court law, such

19  contention neither gives rise to an equal protection claim, nor provides a basis for habeas relief."

20  Little v. Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006).  "Stated differently, the Supreme Court has

21  long settled that the Fourteenth Amendment does not assure immunity from judicial error or

22  uniformity of judicial decisions."  Id., 449 F.3d at 1082; accord Cummings v. Sirmons, 506 F.3d

23  1211, 1237 (10th cir. 2007)(noting the absence of Supreme Court authority "holding that a state

24  court's erroneous application of state criminal law can result in a violation of a criminal defendant's

25  equal protection rights" and declining to adopt such a rule).

26        Here, Petitioner's contention is that, in essence, because other California appellate decisions

27  have disapproved the exclusion of prior convictions that were similarly "remote" as the 1983 DUI

28  conviction in this case, the trial court violated Petitioner's equal protection rights.  As discussed

1  above, such a decision by the trial court, even if error, does not rise to the level of a violation of the

2  Equal Protection Clause of the Fourteenth Amendment.  Little, 449 F.3d at 1082.  Hence, this sub-

3  claim fails to state a cognizable habeas claim.  Id.

4        C.  Right to Confront Witnesses.

5        The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

6  prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him...."

7  U.S. Const., amend. VI.  This right, which is incorporated by the Fourteenth Amendment so as to

8  apply to state prosecutions, Pointer v. Texas, 380 U.S. 400, 85 S.Ct. (1965), "guarantees the

9  defendant [not only] a face-to-face meeting with witnesses appearing before the trier of fact," Coy v.

10  Iowa, 487 U.S. 1012, 1016, 108 S.Ct. 2798 (1988), but also the right to cross-examine those

11  witnesses.  Pointer, 380 U.S. at 404, 406-407; Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct.

12  1074 (1965). ("[A] primary interest secured by [the Confrontation Clause] is the right of cross-

13  examination...."). Thus, "a criminal defendant states a violation of the Confrontation Clause by

14  showing that he was prohibited from engaging in otherwise appropriate cross-examination

15  designed...'to expose to the jury the facts from which jurors...could appropriately draw inferences

16  relating to the reliability of the witness.'"  See Delaware v. Van Arsdall, 475 U.S. 673, 680, 106

17  S.Ct. 1431 (1986).  The "right to cross-examine includes the opportunity to show [not only] that a

18  witness is biased, [but also] that the testimony is exaggerated or [otherwise] unbelievable."

19  Pennsylvania v. Ritchie, 480 U.S. 39, 51-52, 107 S.Ct. 989 (1987).  Moreover, cross-examination

20  may implicate the Sixth Amendment even if it is not certain to affect the jury's assessment of the

21  witness's reliability or credibility.  See Davis v. Alaska, 415 U.S. 308, 317,  94 S.Ct. 1105 (1974).

22  Rather, it is sufficient that a jury "might reasonably" have questioned the witness's reliability or

23  credibility in light of the cross-examination.  Van Arsdall, 475 U.S. at 679.

24        However, even where cross-examination bears on the reliability or credibility of a witness

25  and sufficiently so such that a jury might reasonably question such reliability or credibility, the cross-

26  examination must nevertheless be "appropriate":

27        It does not follow, of course, that the Confrontation Clause of the Sixth Amendment
       prevents a trial judge from imposing any limits on defense counsel's inquiry into the
28        [reliability or credibility] of a prosecution witness.  On the contrary, trial judges retain

wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

See Van Arsdall, 475 U.S. at 679; see also Davis, 415 U.S. at 316 (noting that cross-examination is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation"; Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218 (1931) (holding that a trial court "may exercise a reasonable judgment in determining when [a] subject [on cross-examination] is exhausted" and has "a duty to protect [the witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate"); Wood v. Alaska, 957 F.2d 1544, 1549-1554 (9th Cir. 1992)(explaining that even relevant cross-examination may properly be excluded if its probative value is outweighed by other legitimate interests).  "Because a [trial] court has a good deal of discretion in limiting cross-examination, a reviewing court normally will hold that the [trial] court violated the confrontation clause only it if concludes that the [trial] court denied the jury 'sufficient information to appraise the biases and motivations of the witness.'"  United States v. Jenkins, 884 F.2d 433, 436 (9th Cir. 1989).

Here, Petitioner's counsel was permitted to fully cross-examine Lewis as to her recollection of the events leading up to the fatal accident.  Defense counsel was permitted to impeach Lewis' credibility with a prior felony conviction for false imprisonment.  Defense counsel, on cross-examination of Lewis, was permitted to elicit evidence regarding Lewis' consumption of alcohol before the accident and her history as an alcoholic and the fact that she was driving without a license on the day of the accident, and the defense attorney impeached Lewis with testimony from a deposition in a wrongful death lawsuit in which she was a defendant.  (LD 26, pp. 3068; 3071-3073).  Additionally, a defense expert testified that in his opinion, Lewis and not Petitioner, was the driver.  The 5th DCA concluded that, in addition to being remote in time and of little probative value, the prior DUI conviction had the "potential for undue prejudice... The jury might impermissibly have used the evidence to conclude not just that Lewis lacked credibility, but that she had a propensity for drunk driving.  The [trial] court's statement implies that it concluded that there was a probability of undue prejudice that substantial outweighed the probative value of the past conviction."  (LD 4, p.

1   12).

2        While additional impeachment in the form of the 1983 misdemeanor DUI conviction

3   certainly would not have hurt the defense case, in light of the broad discretion given to state trial

4   judges to reasonably limit cross-examination and to balance the probative value of the impeachment

5   evidence with its prejudicial effect, this Court cannot say with any confidence that exclusion of the

6   conviction had a significant effect on the persuasive power of the defense that was presented to the

7   jurors.  Nor can the Court conclude that the state court's adjudication of this issue was objectively

8   unreasonable or that "fairminded jurists" could not disagree about admitting the proffered evidence.

9   Under such circumstances, the Court must accord deference to the state court's adjudication and, in

10  so doing, must reject Petitioner's claim on this point.[3]

11       D.  <u>Harmless Error</u>.

12       The Court concludes that even if the state court erred in excluding the evidence, and even if,

13  arguendo, such an error rose to the level of a constitutional violation, the error was harmless

14  constitutional error under <u>Brecht v. Abrahamson</u>, 507 U.S. 619 ("A federal court may grant habeas

15  relief based on trial error only when that error had substantial and injurious effect or influence in

16  determining the jury's verdict."); <u>Calderon v. Coleman</u>, 525 U.S. 141 (1998).   The United States

17  Supreme Court has held that the appropriate standard on collateral review for trial errors such as that

18  asserted in Ground One is whether the error resulted in "actual prejudice."  <u>Brecht</u>, 507 U.S. at 622-

19  623, 638.

20       Petitioner has failed to show actual prejudice resulting from the trial court's exclusion of

21  Lewis' 1983 DUI conviction.  The jury was aware that Lewis had participated in an extended

22  drinking binge with Petitioner and was told about Lewis' 1993 false imprisonment felony conviction.

23

24       [3]In its recent <u>Richter</u> decision, the United States Supreme Court once again emphasized how high a bar is set by the

25  AEDPA's deference requirement: "If this [AEDPA] standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected

26  in state court proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther...The reasons for this

27  approach are familiar.  'Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.' It 'disturbs the State's significant interest in repose

28  for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.'" <u>Richter</u>, 2011 WL 148587, *11. (Citations omitted).

Additionally, the jury heard defense expert testimony about the possibility that Lewis, not Petitioner, was driving the car when the fatal accident occurred.  Considering that the 1983 conviction was already twenty years old at the time of trial, the Court cannot conclude that the exclusion of the 1983 conviction, even if constitutional error, resulted in "actual prejudice" to Petitioner nor did it have a substantial and injurious effect in determining the jury's verdict.  Hence, it is harmless.

Based on the foregoing, the Court concludes that the state court's decision regarding this claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Ground Two should be denied.

**Ground Three**      **The Gross Vehicular Manslaughter While Intoxicated Conviction Is Not Supported By Substantial Evidence Of Gross Negligence In Violation Of The Substantial Evidence Rule Derived From The fifth And Fourteenth Amendments' Due Process Clause.**

Petitioner next contends that insufficient evidence was presented to support his conviction on the charge of gross vehicular manslaughter while intoxicated.  (Doc. 1, p. 7).  The Court disagrees.

A.  Standard of Review For Sufficiency of the Evidence.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.[4]

It appears to be an open question in the Ninth Circuit whether AEDPA adds a second level of deference to this standard, so that a federal habeas petitioner may obtain relief only by demonstrating

---

[4] In reviewing sufficiency of evidence claims, California courts expressly follow the standard enunciated in Jackson. See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992).

1   that the state court's adjudication on the merits of the claim involved an unreasonable application of

2   Jackson's "no rational trier of fact" standard.  See Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir.

3   2005); Chien v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004)(en banc).  However, the Court here need

4   not address that issue because the Court reaches the same result whether the record is reviewed

5   directly under Jackson or under the more deferential filter of the AEDPA standard.  See id.

6        This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

7   § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness

8   applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v.

9   Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

10  state court determinations of legal questions or mixed questions of law and fact, the facts as found by

11  the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455

12  U.S. 539, 597 (1981).

13        B.  Sufficient Evidence Was Presented on Gross Vehicular Manslaughter While

14  Intoxicated.

15             1.  The Elements of Gross Vehicular Manslaughter While Intoxicated.

16        In California, gross vehicular manslaughter while intoxicated is defined by statute

17  as follows:

18        Gross vehicular manslaughter while intoxicated is the unlawful killing of a human
          being without malice aforethought, in the driving of a vehicle, where the driving was
19        in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing
          was either the proximate result of the commission of an unlawful act, not amount to a
20        felony, and with gross negligence, or the proximate result of the commission of a
          lawful act that might produce death, in an unlawful manner, and with gross
21        negligence.

22  Cal. Pen. Code § 191.5(a).  Thus, the elements of Penal Code section § 191.5 are: (1) driving a

23  vehicle while intoxicated; (2) when so driving, committing some unlawful act, such as a Vehicle

24  Code offense with gross negligence, or committing with gross negligence an ordinarily lawful act

25  which might produce death; and (3) as a proximate result of the unlawful act or the negligent act,

26  another person was killed.  People v. Verlinde, 100 Cal.App.4th 1146, 1159 (2002).  "[C]ommitting

27  a lawful act in an unlawful manner simply means to commit a lawful act with negligence, that is,

28  without reasonable caution and care.  It follows, then, that in the context of vehicular manslaughter, a

1   killing is unlawful either when one commits a misdemeanor or infraction (an unlawful act, not

2   amounting to a felony) or when one commits a negligent act (a lawful act in an unlawful manner)."

3   People v. Thompson, 79 Cal. App.4th 40, 53 (2000).

4          However, even if the prosecution "fails to prove that the defendant committed a Vehicle

5   Code violation (i.e., unlawful act), the jury may still convict the defendant of gross vehicular

6   manslaughter 'if it finds that the defendant drove in a grossly negligent manner and, that this conduct

7   was the proximate cause of death." Id. "[T]he distinction between an 'unlawful act' and a 'lawful

8   act' done in an 'unlawful manner' tends to disappear in the context of vehicular manslaughter....The

9   act or neglect of duty which satisfies the actus reus element of the offense may in some situations

10  also constitute gross negligence, satisfying that element as well.  It is, however, established that the

11  fact that a defendant drives a motor vehicle while under the influence of alcohol and violates a traffic

12  law is insufficient to constitute gross negligence." People v. Hansen, 10 Cal.App.4th 1065, 1075

13  (1992).

14         Instead, "[g]ross negligence is the exercise of so slight a degree of care as to raise a

15  presumption of conscious indifference to the consequences.  'The state of mind of a person who acts

16  with conscious indifference to the consequences is simply, "I don't care what happens."' The test is

17  objective: whether a reasonable person in the defendant's position would have been aware of the risk

18  involved." People v. Bennett, 54 Cal.3d 1032, 1036 (1991); People v. Ochoa, 6 Cal.4th 1199, 1204

19  (1993).

20         While the test for gross negligence is objective, the defendant's own subjective state of mind

21  is still relevant.  "In determining whether a reasonable person *in defendant's position* would have

22  been aware of the risks, the jury should be given relevant facts as to what defendant knew, including

23  his actual awareness of those risks.  True...the defendant's *lack* of such awareness would not

24  preclude a finding of gross negligence if a reasonable person would have been so aware.  But the

25  converse proposition does not logically follow, for if the evidence showed that defendant *actually*

26  *appreciated the risks* involved in a given enterprise, *and nonetheless proceeded* with it, a finding of

27  gross negligence (as opposed to simple negligence) would be appropriate whether or not a reasonable

28  person in defendant's position would have recognized the risk." Ochoa, 6 Cal.4th at 1205.

(Emphasis in original).

"A high level of intoxication sets the stage for tragedy long before the driver turns the ignition key. 'There is a very commonly understood risk which attends every motor vehicle driver who is intoxicated.  One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.  The effect may be lethal...." Bennett, 54 Cal. 3d at 1038.

Thus, in determining whether a defendant acted with gross negligence, "[t]he jury should...consider all relevant circumstances, including level of intoxication, to determine if the defendant acted with a conscious disregard of the consequences rather than with mere inadvertence." Bennett, 54 Cal.3d at 1038; Ochoa, 6 Cal.4th at 1205.  These circumstances include "the manner in which the defendant operated his vehicle, the level of his intoxication, and any other relevant aspects of his conduct." Ochoa, 6 Cal.4th at 1207.

The trier of fact may conclude from a defendant's "course of conduct and preexisting knowledge of the risks that he exercised so slight a degree of care as to exhibit a conscious indifference or 'I don't care attitude' concerning the ultimate consequences of his actions.  Applying the objective test for gross negligence, any reasonable person in defendant's position would have been aware of the risks presented by his [or her] conduct. '[T]he finding of gross negligence...may be based on the overall circumstances surrounding the fatality.  Intoxication is one of those circumstances and its effect on the defendant's driving may show gross negligence.'" Ochoa, 6 Cal.4th at 1208.

2. Sufficient Evidence Was Presented To Support A Conviction.

Petitioner's contention that insufficient evidence was presented to support his conviction for gross vehicular manslaughter while intoxicated borders on the specious.  The 5th DCA, in its opinion, addressed the same argument as Petitioner now raises, and set forth its analysis of the relevant evidence as follows:

Defendant argues that the record does not contain sufficient evidence that, when he

ran the stop sign, he did so with gross negligence or in a way that was dangerous to human life under the circumstances. He contends that "it does not appear that the failure to stop for the stop sign can be deemed to rise to the level of gross negligence" because it "occurred in a sparsely populated, low-traffic, rural area around 7 a.m." Further, no witnesses testified about any specific conditions that would have made the failure to stop a foreseeable threat to human life.  We reject this argument.

...

Here, the People's and defendant's experts agreed that the Cougar traveled through the stop sign going at least 40 miles per hour.  The evidence established that defendant had been drinking almost continuously for nearly 24 hours.  The parties stipulated that defendant's blood alcohol content was 0.16 percent. Defendant's assertion that it is not grossly negligent to run a stop sign at high speed while very drunk on a country road at 7:00 o'clock in the morning is unsupported by evidence and defies logic.  Country roads may have less traffic than city streets, but it is still reasonably foreseeable that they will have traffic on them at any given time.  The conclusion that defendant's conduct was incompatible with a proper regard for human life is amply supported by the evidence in the record.

(LD 4, pp. 14-16).

First, it is clear that the 5th DCA employed the correct federal standard for insufficiency of the evidence.  Thus, again, the only issue is whether the state court's adjudication of that standard was objectively unreasonable.  It was not.

Here, as the 5th DCA implicitly notes, two of the three elements of gross vehicular manslaughter while intoxicated: the evidence established that Petitioner was driving a vehicle while intoxicated that, as a proximate result of the unlawful act or the negligent act, another person was killed.   Thus, the only possible claim of insufficiency centers on the second element, i.e., that while driving a vehicle in an intoxicated state, Petitioner committing some unlawful act, such as a Vehicle Code offense with gross negligence, or committing with gross negligence an ordinarily lawful act which might produce death.  Petitioner's argument appears to be that the mere running of a stop sign at 7 a.m. while having a blood alcohol level of .16, double the legal limit, does not constitute the commission of an unlawful act with gross negligence.

To the contrary, however, the Court finds it difficult to imagine how running a stop sign under those circumstances could be anything other than gross negligence, considering the unacceptable risk posed by a driver, like Petitioner, who had been drinking constantly for almost twenty-four hours.  As mentioned, the mere fact that Petitioner consumed alcohol and then got behind the wheel of a vehicle alone shows a conscious disregard for the safety of others.  Bennett, 54

1   Cal. 3d at 1038.  Indeed, this would appear to be the quintessential scenario of a driver who had an "I

2   don't care what happens" attitude.  Bennett, 54 Cal.3d at 1036.  Considering all of the "relevant

3   circumstances" discussed above and in the 5th DCA's decision, the jury was justified in finding that

4   Petitioner acted with a conscious disregard of the consequences rather than with mere inadvertence.

5   Bennett, 54 Cal.3d at 1038; Ochoa, 6 Cal.4th at 1205.

6         Based on the foregoing, the Court concludes that the state court's adjudication rejecting

7   Petitioner's claim of insufficient evidence as to gross vehicular manslaughter while intoxicated was

8   not contrary to nor an unreasonable application of clearly established federal law.  Accordingly,

9   Ground Three should be rejected.

10        **Ground Four**          **The Right To A Jury Trial On Aggravating Facts Was Violated In**
                                    **Contravention Of The Sixth Amendment To The U.S.**
11                                  **Constitution.**

12        Petitioner next contends that the trial court's imposition of the upper term and a consecutive

13  term without submitting factfinding to a jury violated his Sixth Amendment right to a jury trial.  The

14  Court disagrees.

15        As mentioned initially, the trial court selected the upper term for count one and, pursuant to

16  California's Three Strikes Law, sentenced Petitioner to a term of thirty years to life.  The court made

17  Petitioner's twenty-five-years-to-life sentence on count four consecutive to the sentence for count

18  one.  (LD 4, p. 6).

19        In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the U. S. Supreme Court

20  held that, other than the fact of a prior conviction, any fact increasing the penalty for a crime beyond

21  the statutory maximum must be submitted to a jury and proven beyond a reasonable doubt.  Id.

22  Blakely v. Washington, 542 U.S. 296 (2004) held that the relevant statutory sentencing maximum is

23  the maximum sentence a judge may impose solely based on the facts reflected in the jury's verdict or

24  admitted by defendant.   However, the Supreme Court also held in that case that, "[o]ther than the

25  fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

26  statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Blakely,

27  supra, 124 S.Ct. at p. 2536.)  In United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005),

28  addressing the constitutionality of the federal sentencing guidelines, the High Court held that if a fact

necessarily results in a mandated higher sentence, the fact must be admitted by the defendant or found by the jury.  Together, these three cases made "courts throughout the land" aware that sentencing schemes that raise the maximum possible term based on facts not found by a jury violate the constitutional rights of defendants.  Cunningham v. California, 549 U.S. 270, 306, 127 S.Ct. 856 (2007)(finding California's determinate sentencing law unconstitutional).

As the 5th DCA's opinion explains, Blakely was decided while Petitioner's state appeal was pending, and he thereafter filed a supplemental brief raising that issue.  (LD 4, p. 19).  In Butler v. Curry, 528 F.3d 624, 633-639 (9th Cir. 2008), the Ninth Circuit held that petitioners, such as Petitioner in this case, whose direct appeals were not final prior to the announcement of Blakely could raise a Blakely/Cunningham issue.  Accordingly, this issue is properly before this Court.

As Respondent correctly points out, under California law, only one aggravating factor is required in order to impose the upper term.  Butler v. Curry, 528 F.3d 624, 633-639 (9th cir. 2007); see Cal. R. Ct. 4.420(a), (b).  Here, the record reflects that the trial court relied in part upon the fact of Petitioner's prior convictions.  (LD 4, p. 22).  This was proper under California law.  See Cal. R. Ct. 4.421(b)(2), (3), (5).  Accordingly, even though the court may have considered other factors, the fact remains that the upper term was justified solely on the basis of Petitioner's prior convictions, facts that Blakely and Cunningham did not require to be submitted to a jury.  Accordingly, the 5th DCA's rejection of this argument was not contrary to or an unreasonable application of clearly established federal law.

As to Petitioner's contention that imposition of consecutive terms violated Blakely, Respondent cites Oregon v. Ice, 555 U.S. 160, 129 S.Ct. 711, 717-719 (2009), in which the United States Supreme Court recently held that states could properly assign the decision whether to impose consecutive or concurrent sentences to the state court without submitting the issue to a jury.  Ice, 555 U.S. at 717 ("The decision to impose sentences consecutively is not within the jury function 'that extends down centuries into the common law.' Instead, specification for the regime for administering multiple sentences has long been considered the prerogative of state legislatures.").

Assuming that Blakely did apply, the 5th DCA's opinion explained its reasons for rejecting Petitioner's argument as follows:

1
2
3
4

Here the imposition of consecutive sentences was proper even if <u>Blakely</u> applies. As explained above, the consecutive sentences were supported by the fact that the two crimes had different victims. The two different victims were identified in the information. The fact that each crime had a separate victim was established by the evidence, was undisputed, and was implicit in the verdicts. Because facts reflected in a jury verdict are a proper basis for imposition of an aggravated sentence under <u>Blakely</u>, there was no error.

5    (LD 4, p. 25).

6    Based on <u>Oregon v. Ice</u>, which represents "clearly established federal law" on this particular

7    point, the Court must conclude that the state court's adjudication was objectively reasonable and that

8    it was neither contrary to nor an unreasonable application of clearly established federal law.

9     **Ground Five**          **The Petitioner's Sentence Pursuant To The California's "Three**
10                              **Strikes Law" Is A De Facto Term Of Life Without The Possibility**
                                **Of Parole And Is An Unconstitutionally Grossly Disproportionate**
11                              **Punishment.**

12    Finally, Petitioner first contends that his sentence of thirty-years-to-life and consecutive

13    twenty-five-years-to-life sentence violate the federal prohibition against cruel and unusual

14    punishment contained in the Eighth Amendment to the United States Constitution.  This contention

15    is without merit.

16    In two companion cases, <u>Lockyer v. Andrade</u>, 538 U.S. 63, and <u>Ewing v. California</u>, 538 U.S.

17    11 (2003), the Supreme Court provided guidance in applying Eighth Amendment jurisprudence to

18    California's Three Strikes law in habeas cases.  In <u>Ewing</u>, the Supreme Court explained that while

19    the constitutional principle of proportionality between crime and sentence applies to noncapital

20    sentences, "[t]he Eighth Amendment does not require strict proportionality between crime and

21    sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."

22    <u>Ewing</u>, 538 U.S. at 23 (citations omitted).  The gross disproportionality principle applies "only in the

23    'exceedingly rare' and 'extreme' case."  <u>Andrade</u>, 538 U.S. at 73 (citations omitted).

24    Applying these standards, in <u>Ewing</u>, the Supreme Court rejected the defendant's claim that a

25    sentence of 25-years-to-life for stealing nearly $1,200 worth of golf clubs was "grossly

26    disproportionate" to his crime where the defendant had previously been convicted of three residential

27    burglaries and a robbery.  <u>Ewing</u>, 538 U.S. at 18.  Similarly, in <u>Andrade</u> the Court reversed the Ninth

28    Circuit's grant of habeas relief to a defendant sentenced to two consecutive 25 years-to-life sentences

1     for two petty theft convictions for stealing five videotapes worth less than $85, and four video tapes

2     worth less than $70, respectively.

3         In <u>Andrade</u>, the Supreme Court concluded that the state court decision upholding the

4     sentence was not "contrary to" the governing legal principles set forth in Supreme Court cases.

5     <u>Andrade</u>, 538 U.S. at 73-74.  The Supreme Court also held that the state appellate court did not

6     "unreasonably appl[y]" the gross disproportionality principle to Andrade's case since that principle

7     "gives legislatures broad discretion to fashion a sentence that fits within the scope of the

8     proportionality principle–the 'precise contours' of which 'are unclear.'" <u>Id.</u>, 538 U.S. at 75-77.

9     According to the Supreme Court, "it was not objectively unreasonable for the California Court of

10    Appeal to conclude that these 'contours' permitted an affirmance of Andrade's sentence." <u>Id.</u>  In

11    addition to <u>Andrade</u> and <u>Ewing</u>, the Supreme Court has also upheld a life sentence under Texas's

12    habitual offender statute for obtaining $120 by false pretenses, <u>Rummel v. Estelle</u>, 445 U.S. 263

13    (1980), and a life sentence *without the possibility of parole* for possession of cocaine.  <u>Harmelin v.</u>

14    <u>Michigan</u>, 501 U.S. 957 (1991).

15         In 2004, the Ninth Circuit held that a Three Strikes sentence of 25-years-to-life for a third

16    offense of shoplifting a $199 VCR was cruel and unusual punishment.  <u>Ramirez v. Castro</u>, 365 F.3d

17    755 (9th Cir. 2004).  The <u>Ramirez</u> petitioner's criminal history consisted of two convictions for

18    second-degree robbery as a result of a single guilty plea entered before the Three Strikes law was

19    enacted.  In that case, the prosecution used two 1991 shoplifting convictions to charge the petitioner

20    in 1995 with one count of petty theft with a prior theft-related conviction. (Cal. Pen. Code § 666).

21    The jury found the two 1991 shoplifting convictions were strikes, the trial court refused to strike

22    either of them, and sentenced the petitioner to 25-years-to-life. <u>Ramirez v. Castro</u>, 365 F.3d at 756.

23         Prior to his third-strike sentence, the petitioner had never been sentenced to prison, and had

24    been incarcerated only one time in the county jail. In finding the sentence unconstitutional, the Ninth

25    Circuit determined that the state court unreasonably applied the gross proportionality principle to the

26    "unique facts of Ramirez's case." <u>Id.</u> at 774.

27         By contrast, in another 2004 case, the Ninth Circuit held that a Three Strikes sentence of 25-

28    years-to-life for a third "wobbler" offense did not constitute cruel and unusual punishment, because

1   the petitioner had a lengthy criminal history, had been incarcerated several times, and the strikes used

2   to enhance the petitioner's sentence involved the threat of violence. Rios v. Garcia, 390 F.3d 1082,

3   1086 (9th Cir. 2004).

4          In light of this jurisprudence, the Court concludes that Petitioner's sentence here is not

5   grossly disproportionate to the offense and therefore the Court must conclude that the sentence

6   imposed in this case and affirmed by the state courts, though harsh, did not offend the Eighth

7   Amendment.

8          The 5th DCA denied Petitioner's claim, reasoning as follows:

9          Defendant argues that his aggregate sentence of 55 years to life, which he describes as
           "a de facto term of life without .. . parole," constitutes cruel or unusual punishment
10         under the federal and California Constitutions.  He contends that his prior strikes
           "occurred in the distant past, many years before the current offenses," and that he has
11         not been convicted of murder.  Therefore, he asserts, "[t]he seriousness of the offenses
           could be amply punished under the non-Three Strikes determinate sentencing
12         provisions."

13         Defendant has not shown that his sentence constitutes cruel or unusual punishment.
           The sentence is within the constitutional parameters established by the case law on the
14         three strikes statutes.  (Ewing v. California (2003) 538 U.S. 11, 18, 19,30-3 1 [three
           strikes sentence of 25 to life not cruel and unusual punishment under federal
15         Constitution for current offense of shoplifting three golf clubs with three prior
           burglaries and a prior robbery]; People v. Romero (2 002) 99 Cal.App.4th
16         1418,1424,1433 [three strikes sentence of 25 to life not cruel or unusual punishment
           under California Constitution for current offense of shoplifting magazine with a prior
17         burglary and a prior lewd act with a child under age 141.)  Defendant's sentence
           punishes him not "merely on the basis of his current offense but on the basis of his
18         recidivist behavior."  (People v. Kinsey (1995) 40 Cal.App.4th 1621, 1630.)
           Defendant implies that his three strikes sentences are less likely to be constitutional
19         because they were imposed consecutively rather than concurrently, but cites no
           authority for this view.  For all these reasons, we find defendant's sentence not to be
20         "grossly disproportionate" and therefore not cruel or unusual.  (Ewing v. California,
           supra, 538 U.S. at p. 23; People v. Romero, supra, 99 Cal.App.4th at p. 1431.)

21

22   (LD 4, p. 26).  Again, the 5th DCA utilized the correct federal constitutional standard; thus, this

23   Court's review is limited to a determination whether the 5th DCA's application of the standard was

24   objectively unreasonable.  The Court concludes that it was not.

25          In Andrade, the U.S. Supreme Court upheld two consecutive 25 years-to-life sentences for

26   stealing videotapes valued at less than $200, after convictions on two counts of petty theft.  Here,

27   Petitioner received a 25 years-to-life sentence consecutive to a thirty-years-to-life sentence for

28   causing a fatality while operating a motor vehicle in an intoxicated state, a crime that is clearly more

1   serious in nature than the petty theft conviction at issue in <u>Andrade</u>.  As in <u>Andrade</u>,  Petitioner was

2   no first-time offender, and, despite Petitioner's protestations to the contrary, his sentence does not

3   preclude parole.

4          Beyond the instant offense, however, the Court must consider Petitioner's prior history,

5   which is far more extensive than in <u>Ramirez</u>, as well as his lengthy prison incarcerations and periods

6   of parole and probation that span most of his adult life.  As the Supreme Court stated in <u>Ewing</u>, "[i]n

7   weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but

8   also his long history of felony recidivism."  <u>Ewing</u>, 538 U.S. at 29.

9          Based on the record now before this Court, Petitioner's criminal history, fully catalogued in

10  the probation officer's report (LD 34), is neatly summarized by the prosecution in its papers

11  opposing the dismissal of the prior strikes:

12        "[Defendant] received his first adult prison commitment in 1980. (This does not
          include his criminal history prior to state prison–the defendant has at least one prior
13        commitment to CYA for armed robbery and another armed robbery reduced to grand
          theft person in 1976 for which he received felony probation).
14
          Because his first prison sentence was for *only* three years the defendant was back on
15        the streets in 1983, and within a month had violated parole.  Without missing a beat,
          the defendant then, using a handgun, committed two first degree robberies, for which
16        he received 13 years, 8 months in state prison.

17        Next, while in Pelican Bay state prison, the defendant committed another felony. He
          was convicted of possessing marijuana for sale.  The defendant was eventually
18        paroled in 1997 and was quickly returned to prison on parole violations.  He was
          ultimately released on January 27, 1999.  Thereafter, the defendant was arrested for
19        assault with a deadly weapon and criminal threats in May 1999, and for auto theft in
          June 1999, just prior to committing the June 22, 1999 felonies which are the basis for
20        this case."

21  (LD 11, p. 355).

22         Given Petitioner's extensive criminal history, spanning over twenty years and including at

23  least six prior felony convictions of increasing severity, violence, and frequency, his case is not "the

24  rare case in which a threshold comparison of the crime committed and the sentence imposed leads to

25  an inference of gross proportionality."  <u>Harmelin</u>, 501 U.S. at 1005.  Thus, Petitioner's prior criminal

26  history can be distinguished from that of the defendant in <u>Ramirez</u>, and does not warrant habeas

27  relief.  As was true in <u>Ewing</u>, Petitioner's sentence is justified by the State's public-safety interest in

28  incapacitating and deterring recidivist felons, and is amply supported by Petitioner's numerous

1    convictions documenting his unstinting disregard for the law.  Ewing, 538 U.S. at 29-30.

2        In sum, Petitioner's sentence, when compared with his underlying offenses, does not violate

3    the Eighth Amendment's prohibition on cruel and unusual punishment.  Based on the foregoing, the

4    Court concludes that the state court's rejection of Petitioner's claim was neither contrary to nor an

5    unreasonable application of clearly established United States Supreme Court precedent. Accordingly,

6    this claim should be denied.

7                                    **RECOMMENDATION**

8        Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

9    (Doc. 1), be DENIED.

10       This Findings and Recommendation is submitted to the United States District Court Judge

11   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

12   Local Rules of Practice for the United States District Court, Eastern District of California.  Within

13   twenty (20) days after being served with a copy of this Findings and Recommendation, any party

14   may file written objections with the Court and serve a copy on all parties.  Such a document should

15   be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

16   Objections shall be served and filed within ten (10) court days (plus three days if served by mail)

17   after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to

18   28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified

19   time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153

20   (9th Cir. 1991).

21

22   IT IS SO ORDERED.

23   Dated:   **February 1, 2011**                          **/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE
24

25

26

27

28